GLADNEY, Judge Ad Hoc.
Appellant, L. Willard Coco, alleging that he sold and delivered to appellee, Walker T. Nolin, two thousand pounds of dallis grass seed for thirty cents per pound, brings this action for the purchase price. Appellee defends on the ground that there was no contract of sale, inasmuch as acceptance was conditioned upon the grass seed meeting standards of quality, purity and germination prescribed by the Louisiana Seed Law, Act No. 372 of 1946, LSA-R.S. 3:1431 -1448, a statute enacted “[t]o assure the availability of quality seed for the growers of Louisiana and to prohibit misrepresentation * * * ” and, inter alia, to regulate the sale, offering for sale, distribution, and transportation of agricultural and other' seeds and plants. Alternatively, appellee pleads, should the court hold there was a sale, then a recission should be decreed, because of defective quality giving, rise to a redhibition.
The growing and marketing of seed in the Parish of Avoyelles, and particularly near Plamburg, has been an -industry since 1915 and is a now well-established industry. The record in this case informs us that it is customary for a producer in that locality to bring to a licensed dealer the seed he has grown and expects to market. The seed is then stored, cleaned, packed and samples are sent to the state laboratory for analysis. There is usually a prevailing price for which the seed are purchased, and 'a fee, about three cents per pound, is charged for cleaning, a process for removing trash and foreign seed. The evidence reveals Mr. Nolin has been in business for a number of years, is a prosperoús cLealer, 'and ships seed throughout the United States.
Act No. 372 of 1946 became effective prior to the contract here in question. By its terms, there was created a Seed Commission, empowered to prescribe rules for determining and fixing standards and tests for all seeds as a condition to, sale or distribution. It required registration and licensing of seed dealers, prohibited the sale of seed under certain conditions, and imposed penalties -for violations. Section 7 of the Act ■requires the Seed Commission, in prescribing its rules, shall give consideration to the minimum requirements of purity, insect infestation, disease infection, and germination. Section 3 defines “pure seeds” and “germination.” From a reading of the Act, it becomes clear that any Louisiana dealer 'in seeds must conform to the requirements of the Act if he would remain in business.
Mr. Coco testified that during the summer of 1947, he brought a load of dallis grass seed to Mr. Nolin and in due course he was paid for it. Later, in September of the same year, he brought another quantity of the grass seed, owned jointly with Edwin Bordelon, to the warehouse of Mr. Nolin, where it was to be cleaned. Appellant’s individual share of the seed approximated two thousand pounds, and he understood he was to be paid by Mr. Nolin thirty cents per pound for clean seed. Mr. Coco denied any knowledge of the Louisiana Seed Law *206 and concluded the sale was complete upon the delivery of the seed.
Appellee Nolin testified that about a week after the seed were cleaned he received reports from the laboratory of the- Department of Agriculture and Immigration of the State of Louisiana, stating the seed should not be resold for planting. He was, however, unable to produce these reports at the trial, explaining he had given them to one F. B. Bordelon, Jr., whose relationship to this case is not clear. He also stated he promptly told Edwin Bordelon, appellant’s partner, the result of the analysis, and requested him to inform Mr. Coco the seed -were not merchantable and that he could not buy them. The record does not show that Mr. Coco was then so informed. It is significant, however, that Edwin Bordelon accepted the verdict and made no effort to press a claim against Mr. Nolin.
At the trial it was testified that during’ the summer of 1947 there came a drought which seriously affected the maturity of seed then growing and reduced materially their qualities of germination. It was shown it is customary during the crop year to obtain three cuttings of dallis grass seed; the first cutting is made in the month of July, the second thirty days later, or longer, depending on the weather, and a third crop is cut off in October. The seed in dispute, because of the prior delivery, evidently were of the second crop and were in all probability affected by the drought. Mr. Coco’s first delivery of seed, for which he was paid, was not touched by the drought and were good seed. Mr. Nolin said he'and all other producers absorbed losses due to the drought in the summer of 1947.
Sometime in February, 1948, demands were made on Mr. Nolin for payment. He thereupon caused samples of Mr. Coco’s seed to be taken and forwarded to the state laboratory for analysis. These reports are incorporated in the record and show the seed to be unsalable because of low germination. To determine the number of good seed, Nolin testified the formula used therefor is to multiply the number of pure seed in each hundred by the percentage of germination found. He testified a minimum of fifteen per hundred is required by the federal and state regulations. Applying the foregoing formula to the findings of pure seed and percentage of germination as disclosed in the reports on two samples of Mr. Coco’s seed, we readily see the minimum requirement -was not equalled. Thus: Report #1810, Pure Seed 27.83%, germination 32.5%; Report #1809, Pure Seed 23.-49%, germination 40.0%. The results are respectively 9.04% and 9.39%.
Mr. Coco virtually takes the position he sold the seed "as is,” that he is not concerned with the quality of the seed, and he knew nothing of the requirements of the-Louisiana Seed Law. Having previously sold appellee seed from the same field, he would naturally 'assume such seed would be of the same quality as the other, except for intervention of the drought and its effect upon the second crop. No attempt was made to rebut evidence that because of this weather condition the later crops of seed were seriously hurt and producers, suffered thereby.
Act No. 372 of 1946 became effective on January 1, 1947, and it is possible that Mr. Coco did not realize the full import of the Act, though he is shown to-have been producing and selling seed for a number of years. In Miles v. Kilgore, Marshall, La.App., 191 So. 556, 559, this court said: “All persons are presumed to know the law. Whether they do in reality know it or not is immaterial as its effects are-visited upon all alike.”
Perhaps 'appellee failed to make known to. appellant in express terms that his purchase of agricultural seed was dependent upon, laboratory and other tests for the purpose-of clearance for resale, but we cannot conceive of a reputable seed dealer buying seed' without knowing the seed to be merchantable. To a dealer, the seed are only useful if they can be ¡resold. Nor could he long remain in business if he sold impure or substandard seed, and subjected himself to prosecution under the statute. Our inference is that Mr. Nolin had no intention of buying the seed “as is.”
By way of argument, appellant says Mr. Nolin is “stopped” from question *207 ing the quality of the seed inasmuch as he did not refuse to accept the delivery hut only requested time for payment. The conclusion is not supported by evidence, but the contrary is shown. Mr. Nolin’s undisputed testimony is to the effect he caused the tests to be made within, a week after the seed had been cleaned, and promptly sent word to Mr. Coco through his partner, Mr. Edwin Bordelon, that the seed were not acceptable because the reports were bad. It may have been oversight, but it is significant that Mr. Coco made no demand for payment until February. The delay in bringing the matter to a conclusion is, therefore, attributable in a measure to the delay of Mr. Coco in contacting Mr. Nolin. The legal point posed has the characteristics of a plea of estoppel, but estoppel has not been specially pleaded as required under our practice. Article 327 of the Code of Practice. We do not find merit in the plea.
Another argument presented by appellant is that the seed were actually of quality acceptable for planting purposes and appel-lee had often purchased seed of a like quality without complaint. The evidence does not disclose that appellee ever purchased seed of such low grade purity and germination. Actually since January 1, 1947, seed of the same germination as those of Mr. Coco could not be sold by a dealer except in violation of the statute. It is admitted Nolin bought from appellant seed grown prior to the drought in 1947, and in prior years, but these were n'ot inferior seed.
Finally it is insisted that this transaction is not governed by the Louisiana Seed Law. The following exemption from the prohibitions of the Act is set out in Section 6 (B) (3), LSA-R.S. 3:1446: “* * * agricultural seed when grown, sold and delivered by the producer on 'his own premises, provided that the growing of such seed is merely incidental to his business of farming * * ■ *”
The interpretation of the provision is unfavorable to appellant. Clearly it is for the purpose of excluding from the effect of the Act a grower of seed where the seed is for use on his own premises and incidental to his business of farming. If the seed should be of unsound quality his own land and his own tenants would be affected but not some other land or distant producer of seed. Apparently the Act principally affected trade between producers and dealers.
The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself. For perfection of the contract there must concur the thing sold, the price and the consent. There is an error of fact, under our law, in that which proceeds from ignorance of that which really exists, or from a mistaken belief in the existence of that which has none. The error is said to bear on the substantial quality of the object, when su'ch quality is that which gives it its greatest value. Obligations made to depend on an, uncertain .event are conditional, and if the obligation is not to take effect until the event happens, it is a suspensive condition. But if the obligation takes effect immediately, but is liable to be defeated when'the event happens, it is then a resolutory condition. Where the object is particularly specified, the obligation becomes perfect by the consent of the parties and renders the creditor the owner, provided the contract be one that purports a transfer. Civil Code, Articles 1820, 1821, 1881, 1909, 2021, 2438, 2439, 2456, 2457, 2458, 2459, 2460.
With the instructions of the foregoing codal articles in mind and applying these rules to the facts herein presented, it is to be seen -that the transaction between the parties was subject either to an error as to the substantial quality of the seed, or that no contract was to take effect until the quality of the seed was verified by laboratory examination. The obligation, in our opinion, was subject to a suspensive condition. We do not find Mr. Nolin was in error as to the nature of the seed, but that he did not assent to 'or contemplate acceptance of plaintiff’s offer to sell until the quality of the grass seed should be determined. The obligation was not intended to become perfect until the happening of this event, and was not one purporting a transfer of the *208 seed until the condition was removed. Sciambra v. Emblem, Inc., La.App., 46 So.2d 631, 634; American Creosote Works v. Boland Machine & Mfg. Co., 213 La. 834, 35 So.2d 749.
The judge a quo, in his reasons for judgment and after analyzing all testimony in the case, found the evidence favorable to appellee and rejected the demands of plaintiff. We are of the opinion the ruling is correct, holding there was no meeting of the minds of the two contracting parties, essential to the legal perfection of a sale, and consequently, the transaction between Mr. Coto and Mr. Nolin did not constitute a sale valid and enforceable as such.
Having concluded that the minds of the parties never met and therefore there actually was no sale, we shall not discuss the legal question presented by appellee in the alternative that there was an implied breach of warranty and the sale should be annulled and rescinded.
The .judgment appealed from is affirmed, at appellant’s costs.
KENNON, J., not participating.